## THE PEOPLE *a.* CANCEMI.

*Court of Appeals; October Term,* 1858.

Trial by Jury.—Consent to Waive.—Return to Writ of Error.—Court.

Trial by jury cannot be waived in criminal cases.

A conviction by a verdict of eleven jurors is illegal, although the prisoner requested and consented, and the prosecuting officer consented, in the progress of the trial, that one of the original panel of twelve jurors be withdrawn, and that the trial proceed with eleven.

Neither the prosecuting officer nor the prisoner have power to make such a consent.

The provisions of 2 *Revised Statutes,* 741, §§ 20, 23—prescribing the contents of the return to be made by the clerk, to writs of error in criminal cases, and declaring that the court shall proceed on that return, and render judgment upon the record before them—do not limit the general power of the court to redress all errors, and for that purpose to bring before it such proceedings in the cause, not fully presented in the record made up in the court below, as may be important to enable it to do so.

*It seems,* that if matters are contained in the return which are out-branches of the record, they may be considered as a basis of decision on a writ of error, if they are such as might have been brought before the court by *certiorari,* if they had not been contained in the return.

The postea embraced in the formal record of judgment of conviction, returned by the general term of the Supreme Court to the Court of Appeals, showed that twelve jurors named were impanelled to try the indictment; and afterwards, on a day named, the trial having been begun, and continued to that day,

rendered their verdict. The return also contained the certificate of the justice who presided at the trial, that during its progress, by the consent of the prisoner, one of the jurors was withdrawn, and the verdict rendered by eleven. This certificate was annexed to the return by an order made at special term.

*Held,* 1. That the special term had power to make such order.

2. That the matters so annexed were not mere out-branches, but a part of the record, and should be regarded in connection with the residue of the return in deciding the case.

3. That the certificate became a part of the *postea,* and qualified it; and, therefore, could not be deemed as contradicting it within the meaning of the rule, that nothing dehors the record which contradicts the record, can be alleged for error.

4. That the conviction had after such withdrawal of a juror was illegal, and judgment must be reversed, and a new trial ordered.

Error to the justices of the Supreme Court, in the first judicial district.

The plaintiff in error was tried at a circuit court of the Supreme Court, holden for the city and county of New York, in the first judicial district, in June, 1858, on an indictment for the murder of one Anderson. The trial commenced on the seventh day of June, before the Hon. WILLIAM B. WRIGHT, and terminated on the nineteenth day of the same month. On the twelfth day of June, one of the jurors, Frederick Muller, was withdrawn by the express consent of the prisoner, and under and in pursuance of a written stipulation made in open court. The circumstance which caused this course was, that one of the witnesses for the prosecution testified in the course of his evidence, that since a former trial of the prisoner, upon the same indictment, he, the witness, had been approached by persons on behalf of the prisoner, among whom was the juror now in question, with offers of large sums of money.

The *stipulation* for the juror's withdrawal will be found below. The juror was accordingly withdrawn from the box, and the trial proceeded with the remaining eleven jurors, who rendered the verdict of guilty. On the twentieth day of June, 1858, Mr. Justice Wright brought to the general term what is stated in the judgment roll to be " his record."

The *postea* therein (as subsequently amended by proceedings which it is unnecessary here to notice), after the usual recitals, and stating that the petit jurors were duly summoned and returned, continued as follows :

" And certain of said jurors [naming twelve], then and there, in the presence of said defendant, Michael Cancemi, being duly, and without exception of record, chosen, tried, sworn, and impanelled, well and truly to try, and true deliverance make between the People of the State of New York, and the said Michael Cancemi then at the bar, whom they would have in charge upon the said indictment for murder, and a verdict give according to the evidence upon their oath aforesaid; afterwards, the said trial being begun, and duly continued until said day, to wit, on the 19th day of June, A. D., 1858, say and give verdict, that the said Michael Cancemi is guilty of felony and murder above charged in the form aforesaid, as by the indictment aforesaid is above alleged against him, to wit, of the murder of one Eugene Anderson, at the city of New York, on the 21st day of July, A. D., 1857, the said Michael Cancemi having been present in court during the whole of said trial, and at the rendering of the verdict; whereupon it is ordered," &c.

No mention was made of the fact of the withdrawal of one of the jurors, and of the rendition of the verdict by the remaining eleven.

On the 10th of July the following reasons were filed in the general term, in arrest of judgment:

I. That it does not appear from the *postea* that any verdict whatever was rendered by the jurors who were impanelled.

II. That it does not appear that the twelve jurors who were sworn to try the defendant, or any of them, have rendered any verdict upon the issues they were sworn to try.

III. That it does not appear that the defendant was present in court, when the verdict of the jury was rendered, if any verdict was ever rendered by said jury, or any of them.

IV. That no judgment can be pronounced upon the defendant, neither the record nor the *postea* showing that the defendant was convicted of the offence charged against him by the verdict of the jury sworn to try him.

After the argument, the general term overruled the reasons in arrest of judgment.

Afterwards, and on the 12th day of July, 1858, Mr. Justice Wright brought to the general term the stipulation and consent of the defendant for the withdrawal of the juror, and also a certificate signed by him, which were as follows:

TITLE OF THE CAUSE.

I certify and state to the Supreme Court, that after the jury had been duly impanelled and sworn, and the trial of the prisoner commenced, viz., on the 12th June, 1858, the an nexed stipulation, consent, and agreement of the prisoner, his counsel, and the counsel on behalf of the people, was presented to the court, and the juror (Frederick Muller) was withdrawn by the express request and consent of the prisoner, and under and in pursuance of such stipulation.

WM. B. WRIGHT

July 12, 1858.

H. E. D.

A stipulation, consent, and agreement, of which the following is a copy, is handed to this court, viz.:

> In the Circuit Court for the First Judicial District of the Supreme Court of the State of New York, which is being held in and for the City and County of New York, of the June Term, A. D., 1858. June the 12th, 1858.

| The People of the State of New York, versus Michael Cancemi. |
| --- |

Upon an indictment charging him with the murder of Eugene Anderson, deceased, Mr. Justice Wright holding the said court.

In open court, this twelfth day of June, of the June term aforesaid, in the year aforesaid, the counsel on the part of defendant having suggested to the court their wish, and that of the defendant, that one of the jurors impanelled in this cause (Frederick Muller) should be permitted to withdraw from the jury, the attorney-general assenting to the suggestion; therefore, the said defendant, Michael Cancemi, now in his proper person here in the open court aforesaid, does consent that the said juror, Frederick Muller, be withdrawn from actual service upon the jury; and that the verdict in this cause be rendered by

and taken from the remaining eleven jurors, and that the twelve names now appearing of record as the jury in this cause, may remain, so that by the record this cause shall appear to have been tried by twelve jurors.

MICHAEL CANCEMI.

Approved by the counsel—

      JOHN W. ASHMEAD,
      E. BLANKMAN,
      L. TREMAIN, attorney-general,
      JOHN McKEON,
      A. A. PHILLIPS.

"Which is ordered on file, and the said Frederick Muller is permitted to withdraw from the jury box."

The defendant was arraigned for sentence, and was asked by the clerk of the general term the following question, viz.: "What have you to say why judgment of death should not be pronounced against you according to law?" Whereupon the prisoner replied, and assigned in writing, as an additional and fifth reason in arrest of judgment, the following, which reason he asked to have placed upon the record, to wit:

V. "I am innocent of the offence charged against me; and as a reason why sentence should not be pronounced, I assign that I was tried by a tribunal unknown to the common law and the constitution, viz., by eleven jurors, and not twelve: I deem this proper to be told why judgment should be arrested."

Whereupon the court, through the presiding justice, stated to the prisoner: "It was your right to be tried by a jury of twelve men, but it appears by the certificate of the circuit judge, before whom your trial was had, that one of the jurors was withdrawn at your own request, and for your own benefit, and at your request the trial proceeded with the remaining jurors. We think, therefore, under these circumstances, and as the application to the court was made at your request and for your benefit, that it is our duty to proceed and pronounce judgment, and which will now be pronounced by the judge who presided at your trial;" to which ruling the defendant then and there duly excepted.

Sentence of death was then pronounced upon the prisoner.

At the time the reasons were filed in arrest of judgment, reasons were also filed for a new trial, and the counsel for the defendant then proposed to argue the same, but the court declined to permit any argument to take place upon the reasons for a new trial, until after the prisoner was sentenced, stating that, if any error occurred in pursuing this course, it should in no respect be permitted to prejudice the defendant.

The defendant having now been sentenced, the court heard the argument for a new trial, and overruled the reasons which had been filed for the same.

The question arising whether the certificate and stipulation formed a part of the record, the court said that it could not be regarded as a part of the record, but might accompany it, and a fifth exception founded on it might be added to the reasons in arrest of judgment.

The counsel for the prisoner subsequently moved at a special term for an order directing the certificate and stipulation to be annexed to the record, and the fact so certified to be added as a *fifth* reason in arrest of judgment, and the following decision granting the motion was made :

TITLE OF THE CAUSE.

SUTHERLAND, J.—Judge Wright having made an additional certificate, by which it appeared that after the jury had been impanelled and sworn, and the trial of the prisoner commenced, by the consent and agreement of the prisoner, his counsel, and the counsel in behalf of the people, one of the jurors was withdrawn at the express request of the prisoner, and under and in pursuance of a stipulation annexed to such additional certificate of Judge Wright, the general term ordered that the fact so certified by Judge Wright should be stated as a fifth reason for the motion in arrest of judgment made by the prisoner.

This ground or reason for the motion in arrest of judgment should therefore be added in the following form :

Vth. "That it appears by the certificate of Judge Wright, and the papers annexed thereto, that one of the jurors sworn in the cause was permitted to withdraw from the jury, and that the verdict was rendered by eleven jurors only."

The motion to add to the record, in this case, the reasons in

arrest of judgment (as thus amended); and also the reasons for a new trial, and also the proceedings on the arraignment of the prisoner for sentence, and also the prisoner's exception to the amendment of the *postea* by Judge Wright, stating expressly the prisoner's presence during the whole trial, and at the rendition of the verdict, as set forth in the motion papers, is granted, and the same must be annexed to the record in this case, and be certified by the clerk.

It is further ordered, that a certified copy of this order be annexed with the said papers to the record.*

July 26th, 1858.

---

* The prisoner's counsel then applied to Mr. Justice Ingraham, at chambers, for an allowance of a writ of error to carry the case before the Court of Appeals, and for a stay of proceedings. The time of the meeting of the Court of Appeals was after the day set for the execution of the prisoner, and consequently, without the stay, the writ would be unavailing.

*J. W. Ashmead,* for the motion.

*J. McKeon,* opposed.

INGRAHAM, J.—Application is made to me for a stay of proceedings upon the writ of error in this case. The exceptions taken upon the trial were considered by the general term as not well taken, and were overruled. If the application rested solely upon the exceptions, I should hesitate before granting this motion.

There is, however, in this case the question which arises as to the mode of trial by eleven jurors. It is true that the twelfth juror was discharged at the request of the prisoner, and under stipulations which, on any other than a capital case, the court might feel at liberty to enforce between the parties. It presents, however, a question, and one which, so far as I have been able to examine the books, is without precedent in a case in which the life of the prisoner is at stake. Some of the cases, which refer to the question when it has arisen upon the mere consent of the prisoner, speak of such an occurrence on the trial as a fatal error, while others admit that the prisoner might waive the right to a full jury. I do not feel at liberty to say that the prisoner should not be permitted to submit his case to the appellate court. It has been urged against this application, that the record shows the trial to have been by the full jury, and that this was in accordance with the agreement and stipulation of the prisoner. I cannot for a moment entertain the idea that a court of justice, having the life of the prisoner at their disposal, should on such a ground deny the prisoner the right of appeal. If he had the power to waive a juror, then the court on appeal will sustain the judgment. If he had no such power, his agreement to the trial by eleven jurors justifies neither court nor officer in taking his life. I should be unwilling in any way to deprive the prisoner of having this question submitted to the appellate court. The general term directed this to be inserted as one of the grounds in arrest of judgment, and the order of Judge Sutherland to amend the record was

Upon the record thus made up, the case came before the Court of Appeals.

*John W. Ashmead*, and *Edmon & B. J. Blankman*, for plaintiff in error.—I. The question may, possibly, arise in this case, what is the record, and what will the court regard as such? It will be contended, on the part of the plaintiff in error, that the record is an authentic testimony in writing of the proceedings in an action at law, which is preserved in a court of record. In other words, it may be defined to be a written memorial, made by a public officer, authorized by law to perform that function, and intended to serve as evidence of something *written*, *said*, or *done*. Hence every transaction which appears authoritatively to have taken place during the trial of the cause, makes up the record. The additional certificate made by Judge Wright to the general term of the Supreme Court, stating that a juror was withdrawn, and that the trial proceeded with eleven jurors, is as much a part of the record as his first certificate. In truth, all that was considered and passed upon by the judge at the Circuit Court, and by the judges who sat at general term in this case, and all that they ordered to be sent to the Court of Appeals, makes a part of the record which it would be against precedent and right not to consider as such. The following authorities will be relied on to sustain these views: 18 *Viner's Ab.*, 176; Jewell *a.* Commonwealth, 10 *Harris*, 94; Fisher *a.* Cockerell, 5 *Pet.*, 253; Reed *a.* Marsh, 13 *Ib.*, 153.

II. The object intended to be accomplished in erecting courts of judicature, was to promote justice and *truth*. What they always strive to ascertain is the *truth;* and they frown upon, and discountenance, in suitors, all attempts to conceal it by means of false writings or false entries. What they most abhor is a *suppressio veri*. How much more reprehensible, then, would it be in a court (the very fountain of truth) to suffer its records to be made up, not according to the actual fact, but according to agreement, so as to exhibit a state of things which did not transpire; rather than an exhibition of what did. Such

made for the purpose of more distinctly presenting this question to the court, upon the writ of error.

Under these circumstances, I am of the opinion that the application to stay the proceedings upon the judgment should be granted.

a mode of procedure would lessen the confidence entertained by the community in courts of justice, and tend, manifestly, to bring them into contempt and disrepute. It is the duty of courts to see that their records contain only the truth, and be in *fact*, what they purport to be in law, *verity*, so that no one shall gainsay or question their truth. There is an express statute to enforce this moral duty in judges. (See 2 *Rev. Stats.*, 921.) The clerk is directed upon any conviction to enter the judgment fully in his minutes, " but the court shall inspect the same, and conform it to the *truth*."

III. In a criminal proceeding, all the substantial requirements of law necessary to make a conviction valid, must appear affirmatively on the record, and they cannot be supplied by conjecture or inference. This principle is elementary, and does not require citations from books to sustain it. All the cases which rule that it is essential the record should show a jury was impanelled— that it should appear the jurors were sworn, that the prisoner was present at the trial, and that he was asked what he had to say why sentence should not be pronounced, according to law— proceed upon this basis. The reason is, that all these matters are essential requisites to make a trial valid, and the law requires the record should show they were complied with, and will not permit the fact to be left to mere inference or intendment.

IV. The *first* and *second* reasons filed in arrest of judgment were: 1. That it does not appear from the *postea* that any verdict whatever was rendered by the jurors who were impanelled. 2. That it does not appear that the twelve jurors who were sworn to try the defendant, or any of them, have rendered any verdict upon the issues they were sworn to try.

The truth of these reasons will appear from an examination of the *postea* returned to the general term. It states that the trial was brought on at a circuit which commenced on the 7th of June, 1858; that certain jurors, whose names are given, were impanelled and sworn, well and truly to try the case, and true deliverance make between the people and the defendant, and a true verdict give according to the evidence. It then adds: "Afterwards, the said trial being begun, and duly continued until said day, to wit, on the 12th day of June, A. D., 1858, *say and give verdict*, that the said Michael Cancemi is guilty of felony and murder above charged in the form aforesaid, as by the in-

dictment aforesaid is above alleged against him, to wit, of the murder of one Eugene Anderson, at the city of New York, on the 21st day of July, A. D., 1857."

It is submitted that this record does not show that any verdict was rendered *by the jury* who were impanelled to try the cause. It is not stated that it was rendered by the *jurors aforesaid*, or by the jurors impanelled to try the issue, but simply mentions the fact of swearing the jury, and the adjournments of the court from day to day; and it then adds, "*say and give verdict*," but by whom it was given does not appear. It is not stated to have been rendered by the jurors, and the language of the *postea* is not only carefully guarded, but is exceedingly vague and indistinct. The words used are not "apt" ones, according to the phraseology of Lord Coke, but are seriously objectionable in a matter so grave as the conviction of a party for an offence which involves his life. In fact, of all matters of substance necessary to set out upon a record, none is so especially essential as that which states the conviction of the defendant by the jury impanelled to try him, and yet this vital fact is the least distinct of all that is written in the *postea*. The conviction of the defendant by the jury, if mentioned at all, is only by intendment and inference; and that in so uncertain a way, that violence is done to the grammatical construction of the language, and it would scarcely be considered sufficiently stated in a civil cause, much less in one that is capital. The reason for this want of distinctness of statement in the *postea*, in the particular mentioned, most probably arose from conscientious scruples on the part of the judge who presided at the Circuit Court, when he came to make up his record. He was aware that twelve jurors had been sworn in the cause, and that their names were upon the record; and he also knew that one of them had been withdrawn from the panel, and the trial proceeded with the remaining eleven, according to his additional certificate returned to the judges of the general term. He could not, under these circumstances, certify with truth that the verdict was rendered by the twelve jurors who had been impanelled in the cause. Nor could Judge Wright, with propriety, sign any certificate which was designed to bear such construction, as it would have been repugnant to truth; and hence, this vital part of the record, which ought to show that the verdict of

guilty was rendered by the jury, was purposely involved in the obscurity in which we find it in the *postea.* It is submitted, however, to the court, that the rendition of the verdict by the jury impanelled to try the defendant was the most essential and necessary part of the whole proceedings, and it ought to have been stated on the record with the utmost precision and certainty. No court (so far as defendant's counsel have been able to ascertain) have ever executed a prisoner upon so informal a statement of the rendition of the verdict of the jury; and the Court of Appeals, it is believed, will not establish the precedent, nor give its sanction to such looseness and uncertainty in criminal proceedings.

V. The *third* and *fourth* reasons filed in arrest of judgment were: 3. That it does not appear that the defendant was present in court when the verdict of the jury was rendered, if any verdict was ever rendered by said jury, or any of them. 4. That no judgment can be pronounced upon the defendant, neither the record nor the *postea* showing that the defendant was convicted of the offence charged against him, by the verdict of the jury sworn to try him.

It is necessary to state that the *postea,* when first returned to the general term by Judge Wright, did not contain these words: "*the said Michael Cancemi having been present in court during the whole of said trial, and at the rendering of the verdict.*" They were subsequently inserted, and the manner in which it was done is thus stated in the Error Book:

"The attorney-general, after the decision of the general term overruling the reasons presented by the defendant in arrest of judgment, applied to the Hon. William B. Wright to amend his *postea* by inserting in it these words, to wit:

"'The said Michael Cancemi having been present in court during the whole of the said trial, and at the rendition of the verdict,' which words were not in the *postea* when first returned to the general term, and which amendment was made by the said justice after the general term had overruled the reasons filed in arrest of judgment, to which amendment the said defendant then and there duly excepted."

As the case stood before the general term, judgment should have been arrested, it nowhere appearing on the record that the defendant was present in court at the rendition of the verdict.

The following cases establish the position that such an omission is fatal: Dunn *a.* Com, 6 *Barr.*, 389; State *a.* Travers, 1 *Overton*, 434; People *a.* Perkins, 1 *Wend.*, 91; Rex *a.* Ladsingham, 2 *Raym.*, 193.

VI. Judge Wright had no authority to alter the *postea*, by inserting in it the words specified in the fifth point, after the question had been presented to the general term and decided by it. The decision which was pronounced by the general term, overruling the reasons in arrest of judgment, disposed of that portion of the case, so far as the circuit judge and the general term were concerned, and it could only be reviewed on writ of error to the Court of Appeals, neither circuit judge nor general term having authority to change the condition of the record in this particular. The existence of such a power would take away from the defendant the right to review the case, as it stood at the time of the argument and decision. It was *res judicata*, and therefore too late to amend. Besides, the statutes of Jeofails never were understood to apply to criminal cases, and no statute of New York authorized such amendments to be made. (1 *Chitty's Cr. Law*, 539; King *a.* Selfe, 8 *Mod.*, 45; 18 *Viner's Ab.*, 176.)

VII. The statement on the record and *postea* as to how the verdict was rendered, is contradictory and uncertain. The first certificate of Judge Wright shows (only by inference, however) that the verdict was rendered by *twelve* jurors, while his second, or additional certificate, states that it was rendered only by eleven jurors. This inconsistency and contradiction in the record makes it insensible. On such a record judgment should be arrested. (*Wharton's Cr. Law*, 618, 1846.)

VIII. The *fifth* reason in arrest of judgment, arising from the fact that the defendant was tried by a tribunal unknown to the common law and the constitution, to wit, by *eleven* jurors instead of twelve, is of itself adequate to arrest the judgment against the defendant. 1. Judicial tribunals are created in all countries, whose jurisdiction and manner of trying criminal offences is ascertained and prescribed by law. 2. In England it is by courts constituted according to the forms of the common law, with the aid of a jury consisting of twelve persons, neither more nor less. 3. In New York, criminal tribunals are created by statute, whose powers and mode of proceeding are according

to the course of common law, regulated by the Bill of Rights, the constitution of the State, and the statutes creating the courts. 4. In civil cases, the right of a party interested to waive the forms of law, and with it trial by jury, is expressly conceded by the constitution; and for this obvious reason, that civil cases affect only private rights, and people are permitted to make what bargains they please in respect to matters which concern their own interests exclusively. 5. In criminal cases, particularly felonies, there can be no waiver of a trial by jury, and a party capitally accused cannot submit his case to arbitration, or to any other tribunal than one expressly created by law to try it; nor can the said tribunal be constituted in any other manner than that ordained by law: hence, when the law prescribes that an accused shall be tried by twelve men, he cannot bargain that he shall be tried by five, or ten, nor by the judge, without the intervention of any jury at all. 6. No instance of the conviction and execution of a prisoner has ever taken place in any country subject to the forms of the English common law, on a verdict rendered by eleven jurors; and if it be allowed in this case, this court will be the first to establish such a precedent,—an example which, it may be safely predicted, will not be followed in any other State of the Union, and will be startling to the English judges, the great expositors of the common law, and the right of trial by jury. (Bill of Rights, 1 *Rev. Stats.*, 302, chap. 4, part 1, § 8; *Const.*, art. 1, §§ 1, 2; 1 *Ib.*, 49.) The petit jury must consist precisely of twelve, and is never to be either more or less, and this fact it is necessary to insert upon the record; if, therefore, the number returned be *less* than twelve, any verdict must be ineffectual, and the judgment will be reversed for error. (1 *Chitty's Cr. Law*, 505.) Twelve jurors must appear on the record to have rendered their verdict, otherwise it is error by the whole court. (Mansfield, C. J., King *a.* Inhabitants of St. Michael's, 2 *Wm. Blacks.*, 719.) If only eleven jurors be sworn by mistake, no verdict can be taken of the eleven; and if it be, it is error. (2 *Hale's Pl. of Cr.*, 296.) Clyncard was indicted and convicted in the Sessions of the Peace, and it did not appear, from the record, that the number of jurors were twelve, and the court said it ought to appear; for, if it were presented by a lesser number, it was clearly ill; wherefore, judgment was reversed. (*Croke Eliz.*, 654.) The

jury is called petit, because two other juries must consist of twelve, and may consist of twenty-three : this jury ought never to be more nor less than twelve; if there be less, the verdict will be ineffectual, and the judgment will be reversed for error. (2 *Haye's Digest Cr. Stats.*, 436.) Lord Dacres, in the twenty-sixth year of Henry VIIIth (1535), being indicted for treason, all the judges met previously to consider any doubts that might arise in that case, and determined that a peer could not waive the trial by his peers. .The same was again resolved on the arraignment of Lord Audley (1631), in the seventh year of Charles I. The reason is, that this mode of trial is not so properly a *privilege* of the nobility, as part of the *indispensable* law of the land, like the trial of *commoners* by *commoners*, enacted, or rather declared, by *magna charta*. ( *Woodeson's Laws of Eng.*, 581.) If one of the jurors be sick, so that he cannot deliberate, and a verdict be taken, it is the verdict of the other eleven, and will be set aside. (Den *a.* Baldwin, 2 *Pennington*, 945.) It is error, if it does not appear by the *record* of a trial of an indictment that the defendant was tried by twelve jurors lawfully sworn. Tilghman, C. J., and all the judges concurred. (Dobler *a.* Commonwealth, 3 *Serg. & Rawle*, 237.) Judgment was arrested where it appeared the case had been tried by thirteen jurors. ( *Wharton's Cr. Law*, 618, 1846; State *a.* Fort, 1 *Car. Law Rep.*, 510; see, also, Whitemarth *a.* Davis, 2 *Haywood*, 113.) A jury must consist of twelve men; no other number is known to the law. (Dixon *a.* Richards, 2 *How. Miss.*, 771; Jackson *a.* State, 6 *Blackf.*, 461; Rose *a.* State, 20 *Ohio;* Work *a.* State, 22 *Ohio*, 296; Carson *a.* Commonwealth, 1 *A. K. Marsh.*, 290.)

It may be alleged that the prisoner having *asked* or *consented* that the juror should be withdrawn, that that fact authorized the court to proceed with the trial, and take a verdict from the remaining eleven jurors. But the prisoner's consent did not change the law. He could, unquestionably, waive many of his constitutional privileges—could consent to the introduction of evidence not strictly legal, and could forbear to interpose challenges to jurors; but he could not consent to the creation of a new tribunal, to try his offence, unknown to the law. In other words, he could not legally consent, as he did, to make the circuit judge and eleven jurors referees to pass upon the question

of his guilt or innocence. What ought to have been done when the juror was withdrawn, is expressed with great distinctness in 2 *Hayes' Digest of Cr. Stats.*, 451, thus: "If a juror become intoxicated, or be taken ill, or depart from the court, during the progress of a trial, whether it be for felony or misdemeanor, the proceedings are at once interrupted. If it be found after due inquiry, upon oath, into the circumstances, that there is no reasonable probability of the juror's early return to his duty, the remaining eleven should be discharged; the clerk of the crown should make an entry of the fact, with the reason of it; and the trial must be recommenced, either at the same or a subsequent assizes." See, also, Rex *a*. Williams, *Russ. & Ryan's Crown Cas. Reserved*, 224. In a capital case a juror cannot be withdrawn, and the trial proceed, though the parties *consent* to it. (Rex *a* Perkins, *Holt's Cas.*, 403; *Carthew*, 465.) On an indictment or murder, the jury, after being impanelled and sworn, were, with the *consent* of the prisoner's counsel, allowed to separate. The judgment of conviction was reversed on that account, Chief-justice Gibson stating that "no consent of a prisoner, in the extremity of his need, ought to bind him, and he ought not to be asked to consent." The court, therefore, treated his consent as a nullity. (Peiffer *a*. Commonwealth, 3 *Harris' Penn. R.*, 468.) Chief-justice Abbott, in Rex *a*. Wolf (1 *Chitt. R.*, 401; 18 *Eng. Com. Law*, 115), says, "I think the consent of the defendant ought not to be asked;" and he adds, "I am also of the opinion that the consent of the judge would not make that lawful which was unlawful in itself." Where, on the trial of an indictment for forgery, the verdict was defective, and the defendant *agreed* to amend it, the court held such verdict did not justify a sentence, and that the *consent* of the defendant did not alter the case. (Commonwealth *a*. Camfield, *Thatcher's Cr. Cas.*, 510.) The constitution of the State of New York permits trial by jury to be waived in *civil cases*, because it concerns only private interests; but it suffers no individual compact or bargain to touch the cherished and great principle of trial by jury in criminal cases, which prescribes a *known, certain, uniform,* and *permanent* rule, which neither legislators, judges, or citizen can transgress, alter, or infringe. The case of The United States *a*. Rathbone (2 *Paine*, 578) was a civil case; and see Bank of Columbia *a*. Okely, 4 *Wheat.*, 235.

*Lyman Tremain,* attorney-general, *John McKeon,* district attorney, and *A. A. Phillips,* for the defendants in error.— I. The Court of Appeals must be governed in their examination and decision of the case by the legal record, which includes not only the judgment record, signed by the justices of the Supreme Court, but also the bill of exceptions. The *judgment record,* signed by the justices of the Supreme Court, sets forth the indictment in the Court of General Sessions of the peace in New York ; the removal into the Oyer and Terminer; the removal into the Supreme Court; the order for trial at the circuit; the *postea,* returning the verdict of guilty against the prisoner; the judgment thereupon by the general term of the Supreme Court ; the writ of error to the Court of Appeals; the judgment of the Court of Appeals reversing the decision of the Supreme Court ; the judgment of the Supreme Court, making the judgment of the Court of Appeals the judgment of the Supreme Court; the second order for trial at the circuit by the Supreme Court; the *postea* returning the verdict of guilty on the second trial ; and the judgment of the Supreme Court thereupon. This record is the roll or memorial of the judge, importing in itself such incontestable verity that it will admit no proof or averment to the contrary; the form of the record is substantially that to be found in the appendix to Blackstone's Commentaries. (*Jacobs' Law Dict., Tit. Record ; 4 Chitty's Black.'s Com., App.*) The *bill of exceptions* is a mode of enlarging the record by incorporating into it, not only the facts of the case, but the rulings of the court in admitting or rejecting evidence, and the instructions to the jury. After it is signed, sealed, and filed, *it becomes a part of the record,* and the matters therein set forth can no more be disputed than those contained in any other part of the same record, and are alike subject to revision in a court of error. The law only knows these documents. All other papers returned by the clerk of the Supreme Court form no part of the record. The Revised Statutes have directed what documents shall be returned on a writ of error, and these alone can form the foundation of the action of an appellate court. The report of the judge who tried the cause, or of the clerk, is not a part of the record. (2 *Rev. Stats.,* 741, §§ 16, 22, 3d ed. ; Ingle *a.* Coolidge, 2 *Wheat. R.,* 363 ; Suydam *a.* Williamson, 20 *How. U. S.,* 427.)

II. The *postea,* as it now appears on the record, is not subject

to the objections made by prisoner's counsel. These objections were matters wholly in the power of the judge who tried the cause to amend. The *postea*, without amendment, showed the fact of prisoner's presence by fair intendment; and had it been incorporated as it stood originally, the court should sustain it, on the authority of State *a.* Croton, 6 *Ired.*, 164, and West *a.* The State, 2 *N. J.*, 212. The cases cited by prisoner's counsel apply to judgment records, not to a *postea*. But the right to amend the *postea* is questioned. For greater caution, it was amended before sentence, before signing the judgment record, by the judge who tried the case, and his right cannot be doubted. (3 *Black.'s Com.*, 386, in notes; 1 *Chitt. R.*, 283; 1 *Mann. & Gr.*, 958.)

III. The motion *in arrest of judgment* was properly denied by the Supreme Court. No motion in arrest of judgment could be made, except for matters appearing on the face of the record. (*Wharton's Am. Cr. L.*, 3043.) It can never be permitted that the declarations of a prisoner, or speeches of counsel, merely because they are reduced to writing, can contradict a solemn record. When a prisoner is called upon to say why sentence should not be pronounced against him, he can plead a pardon, or he may move in arrest of judgment, but only for matters on the record. He can do no more. (1 *Parker's Cr. R.*, 474.)

IV. There was no error in the admission or rejection of testimony.

V. If the Court of Appeals should determine that they will entertain the question as to a trial, at the request of the prisoner, by a jury of less than twelve, the following points are submitted: The judgment record shows that twelve jurors, whose names are given, were impanelled and sworn in the presence of the prisoner, and that the jury convicted him. The bill of exceptions prepared by the prisoner himself, through his counsel, shows that the prisoner was tried and convicted for and of the murder, before Hon. W. B. Wright, justice, holding the Circuit Court, and *a jury thereof:* that on June 19, *the jury* found the prisoner guilty of the murder charged in the indictment. These records are now to be broken down by the introduction of the certificate of the judge, that the prisoner *requested* that one of the jurors should be permitted to withdraw from the jury,

and that the remaining eleven should give the verdict. The consent was signed by the prisoner, and was approved by his counsel. Its language unequivocally expresses the desire, the request of the prisoner, to be tried by eleven jurors. It is conceded that nothing but the consent of the party could try the prisoner with any number less than twelve. No statutory provision could reduce that number of a jury. But this case is founded wholly on the request of the prisoner and his consent. No maxim is more trite, than that consent cannot give jurisdiction; and it is necessary to inquire whether or not this is a jurisdictional question. Jurisdiction (*jus-dicere*) is the legal power or authority to declare the law, to do justice, to have cognizance of offence. (6 *Pet.*, 591 ; 9 *Johns.*, 239.)

In the distribution of power to take cognizance of offences, the constitution and laws of this State have given to the Supreme Court of this State the power to hear and determine capital cases. It is also in the Oyer and Terminer, and by a late statute it is also given to the General Sessions in the city of New York. If any other courts should attempt to exercise any authority or power in such cases, their proceedings would be void, and no consent could give them that authority. If their proceedings were objected to, it might be done before any trial by the jury, by plea. The pleading would deny the authority of the court, and if sustained, would quash all proceedings. But after a court has jurisdiction, matters which the law would give a party a right to insist upon, may be and are continually waived in our courts. Matters which would have been rejected as erroneous are continually held to be valid, on the ground that *consensus tollet errorem*, after the court has acquired jurisdiction.

As to the origin and history of trial by jury, see *Worthington on Juries*, 3, 11–16, 40, 41, 47 ; *Stephens on Pl., App.*, 65 ; *Glan. Lib.*, 13, c. 2 ; *Reeves*, vol. i., 177, 334.

The history of the trial by jury leads to the conclusion that in England it arose out of the action of the court, on the request of the parties : it was a favor granted by the courts. No definite number was fixed upon, of twelve, until the time of Henry II. This number was generally fixed upon, as the ecclesiastical authority had made precedent for it. Lord Coke says the number twelve had something sacred in it, and that was the number of

the apostles. There could have been no reason why the courts would not have granted a less number than twelve to the parties, had they requested a less number. In the course of time, the power of the strong was exercised to oppress the weak, and in Magna Charta was inserted a provision that secured to the people of England as a right that which had been accorded as a favor. That great charter declared that no one should be deprived of life, liberty, or property without the judgment of his peers. Civil and criminal cases were placed on the same platform. The declaration was the submission of the crown to the demands of the people—that trial by jury should be their right —their privilege. The people intended that this privilege should be held in their own hands, without the interference of judges or the crown. In no country has that privilege been guarded with more care than in England, and when our State governments were formed, the provision of Magna Charta was incorporated into our State constitutions, thereby securing to our citizens the same privileges which Magna Charta secured in England to British subjects. In Great Britain, the jury was intended as a protection to the people from the prosecutions of the crown. It was intended as an antagonist to that power. In this country, it has been adopted as a shield which a party has a right to use in his defence or to cast it aside at his pleasure. It is his personal advantage, secured to him by the common law incorporated into Magna Charta, and sanctioned by the constitution of our State. It is his especial protection, of which he cannot be deprived except by his own consent. A case can readily be conceived, even in this country, where the outcry against a prisoner might be so great that no jury would have the courage to acquit, although the party might not, according to law, be guilty: would any one say that the party against whom this outcry was made had no right to say that he did not wish to risk his case before a jury, but he would waive his right to a jury trial, and submit to the decision of the court? There is no distinction between civil and criminal cases, as to a right to a jury trial. There is in the present constitution a provision for a waiver of a jury in civil cases. It will be insisted that this was intended by the constitution not to allow a waiver in criminal cases. The Court of Appeals have, lately, in the Metropolitan Police cases, decided that the maxim of *expressio unius*

*exclusio alterius* is not applicable to the constitution. The constitution also provides another personal privilege, that a party shall not be twice put in jeopardy,—a benign provision of the common law adopted by us. Yet no one will pretend to deny, that unless the party interpose that objection, and bring it before the notice of the court, at a proper stage of proceedings, he would be bound by the judgment on the second trial. In England, no accessory can be tried until after the attaint of his principal; yet it has been expressly held that he can waive that privilege. (2 *Hale*, 224.) There can be no doubt that a party may plead guilty to an indictment for felony. Blackstone says that it may be done, but ought not to be encouraged in capital cases. (4 *Blackst.*, 329.) If a party can waive any jury, can he not waive any number less than twelve? When arraigned, a prisoner may stand mute, or plead, or confess the fact; and in this last case, the court has nothing to do but to award judgment. Executions by death have followed on such confessions of guilt in court. (4 *Blackst.*, 330, *Christian's Notes.*) Cannot a prisoner admit in evidence material facts—can he not, in a case of murder, admit the *corpus delicti*, the finding of a dead body, which in some trials is the turning-point of a case? Can he not, under the constitution of the United States, waive his right to be confronted by his witnesses, before a jury, by admitting written testimony? The maxim, *Quilibet potest renunciare pro se introducto* (*Broom's Max.*), is the foundation of the doctrine that a prisoner can waive any personal privilege, even in a criminal case. In the case of the Kinlochs (1 *Foster's Cr. L.*, 16), Mr. Justice Foster said the question was, whether in a capital case, where the prisoner may make his full defence by counsel, the court may not discharge the jury upon the motion of the prisoner's counsel, and at his own request. He was clearly of opinion that it might be done. He said that the discharging of the jury was not a strain in favor of prerogative. It was not done to the prejudice of the prisoners. On the contrary, it was intended as a favor to them. In that light it was considered by the court; in that light it was considered by the prisoners and their counsel, and accordingly they prayed it; and in that light, Mr. Attorney-general, with his usual candor, consented to it; and in that light, he adds, "I know of no objection in point of law or reason to it." (See case cited in 2 *Ben-*

*nett & Heard's Lead. Cas.*, 337.) The case of Rex *a.* Perkins, *Holt's Cas.*, 403, and S. C., *Carthew*, 463, are overruled in this case; in People *a.* Goodwin (18 *Johns.*), the same cases are repudiated.

The doctrine that a peer cannot waive his privilege, if the law, must have been on the ground that it was not a *personal* privilege belonging to him alone; but, as it was an *honor of inheritance*, the peer could not commit that honor to the hands of any but his peers. (12 *State Tr.*, 1195.) But according to Blackstone, the occasion when he cannot waive his privilege is on a charge of treason. (4 *Chitt. Blackst.*, 401.) It was on merely a political, a State question, he could not waive. But peers have been tried for murder in England, by a common jury. (1 *State Tr.*, 55.) And Hawkins says, " If one who has a title to peerage be indicted and arraigned as a commoner and plead not guilty, and put himself upon the country, he cannot afterwards suggest that he is a peer, and pray trial by his peers." (2 *Hawk., P. C.*, c. 44, § 19; 1 *Chitt. Blackst.*, 401, *notes.*)

Under our constitution, there is no distinction between the right to a jury in a civil and criminal case, as we have before stated, and the right to waive in civil cases has been repeatedly held to apply to constitutional as well as statutory privileges. The maxim, *Quilibet*, &c., is said by our courts to be as applicable to constitutional as to statutory provisions made for the protection of a party. He may renounce it at his pleasure. (*Sedgwick on Const. L.*, 111; Baker *a.* Brenan, 6 *Hill*, 47; People *a.* Murray, 5 *Ib.*, 468; Embry *a.* Conner, 3 *Comst.*, 511; Lee *a.* Tillotson, 24 *Wend.*, 337; Van Hook *a.* Whitlock, 26 *Wend.*, 43, affirming 7 *Paige*, 373.)

To sustain the doctrine that there can be a waiver in a criminal case, the following cases are referred to :

In the People *a.* Parker (6 *Hill*, 47), Judge Cowen, giving the opinion of the court, says that " a constitutional provision made for the benefit of the owner of property can be waived;" and adds : " The maxim, *Quilibet potest renunciare pro se introducto*, applies as well to constitutional law as to any other. Suppose defendant omits to plead *autre fois acquit* to an infamous crime, or pleads guilty, could it be said that the former acquittal should protect him from punishment, because the provision against his being put twice in jeopardy has found its way into the consti-

tution?" (See 2 *Inst.*, 183.) In Lee *a.* Tillotson (23 *Wend.*, 338), Judge Cowen says: "A party may waive a constitutional as well as statutory provision made for his own benefit. The contrary argument would deprive a criminal of the power to plead guilty, on the ground that the constitution has secured him a trial by jury." In the People *a.* Rathbone (21 *Wend.*, 542), Judge Cowen said: "The law allows triers for the benefit of the prisoner or the people. Either may waive it. *Quilibet potest renunciare pro se introducto*, is a maxim of universal application. The prisoner may even waive his right to a trial at the hands of a jury, on the merits, by pleading guilty. Having this power, no one will pretend that he cannot consent to any thing else. He may waive any matter of form or substance, excepting only what may relate to the jurisdiction of the court. His power to agree that the court shall act as triers of a challenge, which may be implied from the course that he and his counsel take in respect to the mode of trial, was held in the People *a.* Mather (4 *Wend.*, 229–245)."

A man cannot legally be indicted and tried as accessory to a felony, till the principal be convicted. Such a trial is contrary to an ancient and fundamental rule of law. "Yet," says Lord Coke, "if he goes to trial without insisting on the objection, he shall be holden to have waived it." To this, he expressly applies the maxim cited. (2 *Inst.*, 183.)

Any agreement deliberately made, any plain assent, express or implied, in respect to the orderly conduct of a suit, or even an agreement to admit a material fact upon the trial, cannot be revoked at the pleasure of the party. In the business courts, such agreements are so common, and, therefore, so apt to be forgotten or misunderstood, that they are generally required by rule to be put in writing. The Court for the Correction of Errors, however, where there is no such rule, hold an oral agreement binding. (Chamberlain *a.* Fitch, 2 *Cow.*, 243–245.) Agreements in the Courts of Oyer and Terminer stand, I presume, generally, upon the same footing. A prisoner on trial there, who defends by counsel, and silently acquiesces in what they agree to, is bound, the same as any other principal, by the act of his agent.

The courts specifically enforce agreements made in respect to the course of the cause by persons properly authorized. They do not allow a party to violate a stipulation and put his antago-

nist to an action. What ought to be done, they will consider either as having been done, or summarily enforce its execution by process of contempt. Where an attorney agreed at the trial to release the interest of a witness who was therefore sworn, on motion for a new trial the court said they would hold him to have been actually discharged, inasmuch as he might compel the attorney to execute his agreement. (Heming *a.* English, 6 *Carr & Payne*, 542; 1 *Cr. Mee & Rose*, 568; 5 *Tyrwh.*, 185.) In Davis *a.* Burton (4 *Carr & Payne*, 166), the defendant's attorney, by consent of the defendant, having orally agreed, at a private interview with the plaintiffs' attorney, to admit certain facts on the trial, the court, upon the cause coming on, and on oral proof of the agreement, held the defendant specifically to perform it, by taking the facts as actually admitted at the trial.

I will not deny, that agreements may be thus enforced in a criminal case. Suppose a prisoner to declare on full advice that he will plead guilty, on which the prosecutor's witnesses are all dismissed; might not the court order the plea entered as if the same consequence had been produced in a civil cause, on an attorney stipulating to give a *cognovit?* All this sounds harsh, and no court would ever enforce a stipulation to plead guilty, unless in a case where they plainly saw that the object of the prisoner was to defraud the course of justice. Agreements to waive his personal right ought not to be enforced except in such cases, though the right of the court may be exercised to the same extent as in civil causes.

The People *a.* Mather (4 *Wend.*, 229, 245, 246) was referred to as a case in which the accused had been allowed to revoke his agreement. He had stipulated that every juror should be considered as challenged by each side. The juror examined appeared to be biased against the accused, who was allowed to revoke his side of the agreement—that is, waive his challenge. The court put his right on the general ground to which I have before adverted, that a party may always waive advantage to himself.

In the United States Court, Judge Thompson held the same doctrine. Judge Thompson says, " All that is necessary is, that there be unequivocal evidence of waiver of his rights;" which appears in Cancemi's case, under his own hand, and approved

by his counsel. In 2 *Bennett & Heard's Lead. Cas*, 337, there is a note in which have been collected together cases with regard to juries of less than twelve. It shows that under our constitution, and that of the States of the Union, no man can be tried for a crime *against his consent* without a jury of twelve. It shows that legislation cannot dispense with unanimity in juries of twelve, but it shows the party himself can, and adds: "Like any other right or privilege, the right of trial by twelve jurors can, doubtless, be waived by the person for whose benefit it was provided; and if he consent to be tried by a less number, their verdict would not be erroneous." (See United States a. Rathbone, 2 *Paine, C. C.*, 578.)

It may be proper to refer to some of the authorities on which probably the prisoner's counsel may rely. The case of Germond a. The People (1 *Hill*, 343), only maintains the conceded doctrine that consent cannot give jurisdiction. The court speaks of the question as one of jurisdiction, as the act of arbitrators *not adopted by the court*. Had it been adopted by the court, the opinion says, that whether or not it could be reviewed is *very questionable*.

In the case of Cutter a. Creswick (3 *Keble*, 362), referred to in Germond a. The People, which occurred in the time of Charles II., there was a jury of seven. The report says: "The amerciant is tried by a jury of seven, which *per curiam* is ill, and must be twelve. There is nothing to show that there was consent given."

The case of The King a. The Inhabitants of St. Michaels (2 *Sir Wm. Blackst.*, 719) was a presentment, by two justices of the town sessions, of a highway as being out of repair. The presentment was traversed; and issue being joined thereon, a venier was awarded on the record for twelve jurors to try the issue. And the record stated that "*the jurors, by the sheriff aforesaid being called and impanelled for the purpose, came*, and found a verdict for the crown."

The record was removed into the King's Bench by a writ of error, where it was objected that "there are no jurors named in the record. Nor is it as much as stated that they are twelve in number, *which is distinctly necessary to appear on the record*." The record in Cancemi's case shows twelve names, and it conforms to this decision.

The report says judgment was reversed, but there is a note in the following words: "Sergeant Hill in his MSS. says that this case is wrong reported, and that the judgment was affirmed."

Clycard's case (*Cro. Eliz.*, 654) covers the question of the finding of an indictment. Clycard was indicted on the 8th Hen. VI., ch. 9. The record was, "*Ad sessionem pacis, &c., per sacramentum A. B. C. D., et aliorum legalium hominum de comitatu prædicto præsentatum existet, &c.*, and it appeareth not that it was *per sacramentum twelve;* for if it were presented by a lesser number, it was clearly ill; wherefore it was reversed. The marginal note is: "The caption of an indictment must show that it was taken by the oaths of twelve men." The case is not one of consent to a jury less than twelve.

In Peiffer *a.* The Commonwealth (3 *Harris*, 468), the prisoner was convicted of murder. The jury was allowed to *separate.* The court in Pennsylvania decided that the jury could not separate, even with the consent of the prisoner, and ordered a new trial. The remarks of Chief-justice Albert, in Rex *a.* Wolf (1 *Chitt. R.*, 401), and Mills *a.* The Commonwealth (1 *Harris*, 627), are referred to for the purpose of sustaining the decision. The courts of the United States also permit such separation, *even without the consent of the prisoner.* The court in Pennsylvania admit, that, if a prisoner consent to the discharge of a previous jury, it is an answer to a plea of former acquittal.

These have no bearing on our case. The case decided in Chitty's Reports was that of a jury separating without consent, in a case of misdemeanor. Denman *arguendo*, said nothing could authorize the dispersion of the jury, *except* the *consent* of the defendants.

This case shows that the dispersion of the jury is a matter of discretion, in a case of misdemeanor, with the judge; the consent of the prisoner has nothing to do with it. The prisoner's consent was not in the case, *as the jury separated without the defendant's knowledge.*

The case of Mills *a.* The Commonwealth (1 *Harris*, 627) was one in relation to consent giving jurisdiction. The Court of Quarter Sessions, at an adjourned session, had, no authority to try the charge against the prisoner, and his consent could give no such authority. In the opinion given by the judge of the Pennsylvania court, he cites the remark of an English judge in

the case of the King *a.* Wolf (1 *Chitt. R.*, 401), to the effect that the prisoner's consent ought not to be asked. The case of Rex *a.* Wolf was one of misdemeanor, and the judge said that he would not ask the consent of the prisoner to discharge a jury. He had nothing to say to it. The court could discharge *without* his consent, in a case of misdemeanor.

The case of Writ *a.* The State of Ohio (1 *Warden*, 2 Ohio, 296) arose out of a law of Ohio authorizing a jury of six in a case of assault and battery. The prisoner demanded twelve, and the court say that he had a *right* to that number, and the statute of Ohio was unconstitutional, as made in violation of the citizen's right to twelve.

The cases cited on behalf of the prisoner presented questions as to the rights of prisoners, of which they had been deprived *without their express consent.* None of them are applicable to a case like the present, arising out of the *request* of the party to have his rights waived.

In Jones *a.* State of Ohio (*Ohio R.*), the prisoner was tried; and while the jury was out considering his case, he was remanded to the jail. The jury returned to the bar while the prisoner was absent, but his counsel was present at the rendition of the verdict. The jury returned a verdict of guilty; the prisoner's counsel making no objection, on the ground of his client's absence. The court reversed the judgment, but said: "These rights *may be waived by the accused party*, if he thinks proper." But whether they can be waived by counsel, is a matter of doubt.

It may not be improper to refer to the fact, that this appeal arises in a case in which three trials have been had, and two verdicts of juries. Should the court order a new trial, there can be no question that we shall have the case again before this court, on a plea of having been once put in jeopardy on former conviction.

By the Court.—Strong, J.—The return to the writ of error in this case contains a formal record of judgment, setting forth an indictment against the plaintiff in error, in the Court of General Sessions of the Peace in the city and county of New York, for the crime of murder; the plea of the plaintiff in error traversing the indictment; the removal of the indictment into the

Court of Oyer and Terminer of said city and county, and sub-sequently into the Supreme Court; the *postea* or certificate of the justice who held the Circuit Court at which the trial of the indictment was, by a general term of the Supreme Court in the first judicial district, ordered *to* take place, and was had; the proceedings at the trial, showing that a verdict of guilty was rendered; and the judgment of the Supreme Court, at a general term in said district, sentencing the plaintiff in error to the pun-ishment of death. This record is signed by the four justices of the Supreme Court, before whom, it is stated in the record, the general term was held at which the judgment was given. A bill of exceptions, setting forth portions of the testimony, and several exceptions to rulings at the trial upon questions of evi-dence, is also embraced in the return, which, it is conceded on the part of the people, is to be regarded as a part of the record, and as such to be properly before the court. The *postea*, em-braced in the formal record of judgment as above stated, shows that twelve jurors, whose names are given, were duly chosen, sworn, and impanelled to try the indictment; and afterwards, on a specified day, the trial having been begun and duly con-tinued to that day, rendered their verdict. The bill of excep-tions states that the trial was before the justice holding the Cir-cuit Court, and a jury thereof, called, impanelled, and sworn, and that the jury found the prisoner guilty of the murder charged in the indictment.

In addition to the matters above mentioned, the return to the writ of error includes a certificate of the justice before whom the Circuit Court, at which the indictment was tried, was held, stating to the Supreme Court, that after the jury had been im-panelled and sworn, and the trial of the prisoner commenced, a stipulation consent and agreement, of the prisoner, his coun-sel, and the counsel on behalf of the people, annexed to the cer-tificate, was presented to the court, and the juror, Frederick Muller, was withdrawn by the express request and consent of the prisoner, and under and in pursuance of such stipulation. The stipulation is next set forth at length, with a statement that it was handed to the court and ordered on file, and that the said Frederick Muller was permitted to withdraw from the jury-box. Following the certificate and stipulation, are several reasons stated to have been filed in arrest of judgment; among which is,

that it appears by the said certificate, and the papers annexed thereto, that said juror was permitted to withdraw from the jury, and that the verdict was rendered by eleven jurors only; which reasons, it is stated, were, after argument, overruled by the court. It is then added, that several reasons for a new trial were filed,—which are given in full, being the exclusion of evidence at the trial, and presenting the same questions which arise upon the bill of exceptions; and which reasons, it is stated, were subsequently argued and overruled.

The proceedings on the arraignment of the plaintiff in error are also stated, from which it appears that he urged as a reason why judgment should not be pronounced against him, that he was tried by a tribunal unknown to the common law and the constitution, viz., by eleven jurors, and not twelve; and that the court overruled the same, on the ground that it appeared by the aforesaid certificate that one of the jurors was withdrawn at the request and for the benefit of the plaintiff in error, and that it was at his request the trial proceeded with the remaining jurors.

An order of the Supreme Court, at a special term in the first judicial district, duly certified by the clerk, is next given, which recites the aforesaid certificate, in reference to the withdrawal of a juror, and states that the general term ordered that the fact so certified should appear as a fifth reason for the motion in arrest of judgment, made by the prisoner; that this ground or reason for the motion in arrest of judgment should therefore be added in the form in which it appears. After which, the order proceeds as follows: "The motion to add to the record in this case the reasons in arrest of judgment (as thus amended), and also the reasons for a new trial, and also the proceedings on the arraignment of the prisoner for sentence, &c., granted, and the same must be annexed to the record in this case, and be certified by the clerk. It is further ordered, that a certified copy of this order be annexed with the said papers to the record."

The principal ground of error relied on in the case, appears only by that portion of the return which is additional to the formal record of judgment, and the bill of exceptions; and it is made a point, on the part of the people, that this additional matter was not called for by the writ of error, and was imperfectly returned, and that it cannot be considered by the court. It is

The People *a.* Cancemi.

necessary, therefore, at the outset, to determine the question, whether this matter is legally before the court, and can be regarded in connection with the residue of the return, in examining and deciding the case.

The Revised Statutes (vol. ii., p. 741, § 20), in an article relating to writs of error on judgments in criminal cases, provide, that upon any writ of error being filed which shall operate as a stay of proceedings—and such is the effect of the writ in the present case—" it shall be the duty of the clerk of the court to make a return thereto without delay, containing a transcript of the indictment, bill of exceptions, and judgment of the court, certified by the clerk thereof." It is further provided, by § 23, that " no assignment of errors, or joinder in error, shall be necessary in such a case, but the court shall proceed on the return thereto, and render judgment upon the record before them." It is insisted that, under these provisions, nothing could regularly be returned to the writ in this case, but what is particularly specified in the section first above mentioned of the statutes, and that the court must give judgment upon the return only so far as it is in accordance with that section, disregarding every thing else which it contains. We think it was not the intention of the Legislature, by these sections, to prevent the review and correction of errors, in cases to which the sections relate, appearing in the outbranches of the record, and which are, independent of the sections, proper subjects of a writ of error; and that such is not their effect. This court is invested by law with " full power to correct and redress all errors that have happened or may happen in the Supreme Court" (1 *Laws of* 1847, p. 321, § 8); and the Revised Statutes relating to writs of error generally, and " the proceedings thereon (vol. ii., p. 599, § 45), declare that a *certiorari* to certify any diminution, variance, or other defect in any record or proceeding, may be issued by the court to which a writ of error shall be returnable, to the court upon whose judgment such writ shall be brought, and shall be served on a clerk thereof, and shall be returned by him according to the command of such writ." This section appears to be applied to criminal as well as civil cases. It forms part of a title prescribing the proceedings and practice on writs of error, some of the provisions of which, it is expressly declared, shall not extend to any writ of error brought upon any judgment rendered

upon any indictment (p. 597, § 31); thereby showing that the other provisions are applicable to criminal cases, so far as they can properly be applied to them, and are in harmony with other parts of the statute specially relating to such cases. We think the statute prescribing the contents of the return to be made by the clerk in criminal cases, and declaring that the court shall proceed upon that return and render judgment on the record before them, does not limit the general power of the court to correct and redress all errors, and for that purpose to bring before it such proceedings in a cause, not fully presented in the record made up in the court below, as may be important to enable it to do so.

If, then, the matters in the return in the present case, which are objected to, are to be viewed as outbranches of the record, which, if they had not been returned, might have been brought before the court by *certiorari*, and considered in determining the case, there seems to be no good reason why, being in the return, they may not, so far as they disclose facts which might be assigned for cause, and for which a writ of error will lie, receive like consideration, and be made a basis of decision. We do not consider how far those matters regarded as *dehors* the record would be ground of error, under the well-settled rule that nothing can be alleged for error which contradicts the record, for that view of the return is not, in our judgment, the correct one in the case.

The true legal view of the return on this subject, we are satisfied, is, that the matters in question, so far as they are material in the case, are more than mere outbranches of the record; they are, in fact and in legal effect, part of the record in the Supreme Court returned to this court; as much so as the indictment, or any other part of the proceedings. The order of that court, at special term, granted the motion to add the same to the record, and directed that they be annexed thereto, which appears to have been done. This order, if the subject of it more properly belonged to the general term, was, nevertheless, valid; there was no want of power at the special term to make it. These matters were annexed as added to the record, and thereby became a part of it. They must be treated, therefore, as if they were inserted in the body of the record, and be considered, in connection with the rest of the record, in regard to the errors

which are alleged. In this view, the certificate that one of the jurors was withdrawn, is part of the *postea*, and qualifies it; and no basis exists for the position of the defendants in error, that these matters contradict the record. The record originally made up in the court below, and the supplemental matters added, constitute the record of that court as returned to this court. It shows that although the petit jury, when first impanelled, was composed of twelve jurors, one was afterwards withdrawn, and the trial proceeded with, and the verdict was rendered by only eleven; and no inconsistency in it appears. The main question relied on by the plaintiff in error—viz., whether his conviction by a verdict of eleven jurors, although he consented and requested in the progress of the trial, that one of the original panel of twelve jurors be withdrawn, and that the trial proceed with eleven jurors, was legal, is, therefore, upon the facts, before the court in the case, and it may well first receive attention. If this question shall be determined in favor of the plaintiff in error, it will not be necessary to examine any of the other questions raised.

It is conceded on the part of the people, and is very clear, that but for the consent of the plaintiff in error, he could not lawfully have been tried by eleven jurors. A legal jury, according to common law, consists of twelve persons. (2 *Hale, P. C.,* 161; 1 *Chitt. Crim. L.,* 505; *Bac. Ab., tit. Juries A.;* 2 *Bennett & Heard's Lead. Cas.,* 327.) Our constitution, Art. 1, § 2, declares, that " the trial by jury, in all cases in which it has heretofore been used, shall remain inviolate forever ;" and the Revised Statutes provide, in reference to trials in criminal cases, that the twelve first jurors who shall appear on being called, and be approved as indifferent, shall constitute the jury. (2 *Rev. Stats.,* 734, § 5, 735, § 14, 420, § 61.)

But it is insisted that the plaintiff in error might waive his right to a trial by a jury of twelve persons; and that having done so, the trial and conviction in this case were valid. The researches of counsel have not enabled them to refer the court to any case directly in point, either in favor or against this proposition, nor are the court aware of any such case; and hence it must be examined and decided in the light of principle, and such analogies as reported decisions afford.

There is, obviously, a wide and important distinction between

civil suits and criminal prosecutions, as to the legal right of a defendant to waive a strict substantial adherence to the established constitutional, statutory, and common-law mode and rules of judicial proceedings. This distinction arises from the great difference in the nature of such cases, in respect to the interests involved and the objects to be accomplished.

Civil suits relate to, and affect, as to the parties against whom they are brought, only individual rights which are within their individual control, and which they may part with at their pleasure. The design of such suits is the enforcement of merely private obligations and duties. Any departure from legal rules in the conduct of such suits, with the consent of the defendants, is, therefore, a voluntary relinquishment of what belongs to the defendants exclusively; and hence there is manifest propriety in the law allowing such consent to have the effect designed by it in most cases, as to matters within the jurisdiction of the courts. The law does recognize the doctrine of waiver to a great extent; in some instances, even to the deprivation of constitutional private rights. (Embury *a*. Conner, 3 *Comst.*, 511; Tombs *a*. The Roch. & Syr. R. R. Co., 18 *Barb.*, 583.) But it is even settled that in civil cases consent will not confer jurisdiction of the subject-matter; and where such jurisdiction exists, a change, by consent, of the mode of proceeding, may be so extensive as to convert the case from a judicial proceeding into a mere arbitration. (Green *a*. Patchin, 13 *Wend.*, 293; Silvester *a*. Redfield, 19 *Ib.*, 21; Dederick's Admin. *a*. Richley, *Ib.*, 109.) The substantial constitution of the legal tribunal, and the fundamental mode of its proceeding, are not within the power of the parties. It was deemed necessary to insert in our present constitution a provision that "a jury trial may be waived by the parties in all civil cases in the manner prescribed by law," to authorize even the Legislature to confer a right to dispense with that mode of trial. This is a solemn judgment of the organic law, that, without such a provision, the trial by jury, in cases where it had theretofore been used, could not be dispensed with.

Criminal prosecutions involve public wrongs—"a breach and violation of public rights and duties"—which affect "the whole community, considered as a community, in its social and aggregate capacity." (3 *Blackst. Com.*, 2, 4; *Ib.*, 4.) "The end they

have in view is the prevention of similar offences, not atonement or expiation for crimes committed." (*Ib.*, 11.) The penalties or punishments, for the enforcement of which they are a means to the end, are not within the discretion or control of the parties accused; for no one has a right, by his own voluntary act, to surrender his liberty or part with his life. The State—the public—have an interest in the preservation of the liberties and the lives of the citizens, and will not allow them to be taken away " without due process of law." (*Const.*, Art. 1, § 6.) When forfeited, as they may be, as a punishment for crimes, criminal prosecutions proceed on the assumption of such a forfeiture, which, to sustain them, must be ascertained and declared as the law has prescribed. Blackstone (vol. iv., p. 189) says: " The king has an interest in the preservation of all his subjects." And again (vol. i., p. 133), that the " natural life being the immediate donation of the great Creator, cannot legally be disposed of or destroyed by any individual, neither by the person himself nor by any other of his fellow-creatures, merely upon their own authority." These considerations make it apparent that the right of a defendant in a criminal prosecution to affect, by consent, the conduct of the case, should be much more limited than in civil actions. It should not be permitted to extend so far as to work radical changes in great and leading provisions, as to the organization of the tribunals, or the mode of proceeding prescribed by the constitution and the laws. Effect may justly and safely be given to such consent in many particulars, and the law does, in respect to various matters, regard and act upon it as valid. Objections to jurors may be waived; the court may be substituted for triers, to dispose of challenges to jurors; secondary in place of primary evidence may be received; admissions of facts are allowed; and in similar particulars, as well as in relation to mere formal proceedings generally, consent will render valid what without it would be erroneous. A plea of guilty to any indictment, whatever may be the grade of the crime, will be received and acted upon, if it is made clearly to appear that the nature and effect of it are understood by the accused. In such a case, the preliminary investigation of a grand jury, with the admission of the accusation in the indictment, is supposed to be a sufficient safeguard to the public interests. But when issue is joined upon an indictment, the trial must be by

the tribunal, and in the mode which the constitution and laws provide, without any essential change. The public officer prosecuting for the people has no authority to consent to such a change, nor has the defendant.

Applying the above reasoning to the present case, the conclusion necessarily follows, that the consent of the plaintiff in error to the withdrawal of one juror, and that the remaining eleven might render a verdict, could not lawfully be recognized by the court at the circuit, and was a nullity. If a deficiency of one juror might be waived, there appears to be no good reason why a deficiency of eleven might not be; and it is difficult to say why, upon the same principle, the entire panel might not be dispensed with, and the trial committed to the court alone. It would be a highly dangerous innovation, in reference to criminal cases, upon the ancient and invaluable institution of trial by jury, and the constitution and laws establishing and securing that mode of trial, for the court to allow of any number short of a full panel of twelve jurors; and we think it ought not to be tolerated.

The opinion of the judges of the Court of King's Bench, in the case of Lord Dacres, tried in the reign of Henry the Eighth for treason, strongly fortifies the conclusion above expressed. One question in that case was, whether the prisoner might waive a trial by his peers and be tried by the country; and the judges agreed that he could not, for the statute of Magna Charta was in the negative, and the prosecution was at the king's suit. (*Kelyng's R.*, 59.) Woodeson, in his Lectures (vol i., 346), says: "The same was again resolved, on the arraignment of Lord Audley, in the seventeenth year of the reign of Charles the First;" and that the reason was, that the mode of trial was not so properly a privilege of the nobility as part of the indispensable law of the land, like the trial of commoners by commoners, enacted, or rather declared, by Magna Charta. In 3 *Inst.*, 30, the doctrine is stated, that "a nobleman cannot waive his trial by his peers, and put himself upon the trial of the country—that is, of twelve freeholders; for the statute of Magna Charta is, that he must be tried *per pares*, and so it was resolved in Lord Dacre's case."

It is unnecessary to pursue this discussion further; and it remains only to add, as the result of the foregoing views, that in the opinion of the court the judgment below should be reversed, and a new trial ordered.